U.S DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED  SHREVEPORT

FEB 2 7 2014

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA

**NORMAN J. CHACHKIN, Esq**
**36 Cedar Drive**
**Accord, NY 12404**
(845) 626-3092

February 25, 2014

Hon. Corey Whidden
Deputy Clerk
United States District Court for
    the Western District of Louisiana
United States Courthouse
300 Fannin Street, Suite 1167
Shreveport, Louisiana 71101

          Re:    Conley, et al. v. Lake Charles
                  School Board, et al.
                  <u>No. 2-64-cv-09981-PM</u>

Dear Mr. Whidden:

      I am writing to follow up on our recent telephone conversation concerning this matter, and to set forth the basis for my request to be removed from being listed on the docket in the above-captioned matter as counsel for the plaintiffs. I very much appreciate your invitation to do so and will attempt in this communication to be as detailed and comprehensive as possible in describing the rather complicated history of this litigation and my very limited role in it.

      According to my records, as contemporaneously recorded, I first spoke with you about the matter on May 1, 2012, when I became aware of the electronic docket in this case. At that time, I explained orally to you that I had never entered my appearance as counsel nor participated in district court proceedings in this matter, and that I could not discern nor understand the basis on which the original paper docket (Document #1 on the electronic docket created April 30, 2012) included my name in the listing of counsel. After our discussion, I did not follow up on the matter immediately, in part because there were no developments in the case and also because there was no urgency relating to my personal circumstances.

I contacted you again yesterday because those circumstances have changed and require that I attempt now to have my name removed from the electronic docket in this matter as counsel for the plaintiffs — to say nothing of being identified as "lead counsel." I offered to prepare a written explanation of my position that could be forwarded to Judge Minaldi or her clerk, as necessary, or dealt with otherwise as appropriate, in order to clarify the issues involved. This letter is my attempt to do that.

Let me begin by asking that you look at the first page of the original paper docket (Document #1 on the electronic docket). That document, in the upper right-hand corner, contains a listing of counsel for plaintiffs. That listing begins with the Louisiana attorneys who filed the action in 1964 (A.P. Tureaud, A.M. Trudeau, and Ernest Morial) of New Orleans, and it also includes my name in a second grouping of attorneys for plaintiffs — but I respectfully suggest that a close examination of the document reveals quite clearly that my name was added to this listing at some time <u>after</u> the original listing on the sheet was made.

I remain unaware of any circumstances that made such an addition appropriate; and in any event, as I explain further in this letter, whatever the situation was on November 4, 1980 — the last entry on this paper docket until 2012 — there were subsequent and dispositive proceedings in this case (of which I had no knowledge), and in those proceedings neither I nor any other attorney originally associated with the NAACP Legal Defense Fund either appeared or could be said to have represented, in any fashion, the original *Conley* plaintiff class.

I deal first with the question of the basis upon which the Clerk's Office could have determined to add my name to the listing on the first page of the paper docket we've been looking at. I note initially that a review of the nine pages of that docket do not mention my name anywhere, although they contain references to, *inter alia*, Mr. Tureaud (*e.g.*, page 5 of 9, entry of 11-14-68), William Bennett Turner, who was on the staff of the Legal Defense Fund at the time (*e.g.*, *id.*, entry of 12-19-68), and Jack Greenberg, the former Director-Counsel of the Legal Defense Fund (*e.g.*, page 6 of 9, entry of 7-10-69).

There is, I believe, a plausible explanation of how the Clerk's office may have picked up my name even though I neither appeared in any proceedings in this case in the district court nor was admitted *pro hac vice* in the matter before the district court.

At the time this matter was filed in 1964, it was the practice of the Legal Defense Fund to list, on pleadings, both the Director-Counsel of the organization and all other attorneys who might have supervisory oversight over staff lawyers working directly on the matter (as I did from 1969-1975, when I coordinated the work of staff lawyers in school desegregation suits). The reason for this practice was that a number of southern states had attempted to prevent the NAACP and/or the Legal Defense Fund from providing representation to plaintiffs in school desegregation suits on the ground that such involvement constituted the unauthorized practice of law by a corporate entity.

For instance, in 1958 the State of Arkansas brought an action against the Legal Defense Fund from undertaking such representation because it would, allegedly, violate a statute that prohibited corporate practice of law, *Arkansas ex rel. Bennett v. NAACP Legal Defense Fund*, No. 45183 (Cir. Ct. Pulaski County), and a similar action to impose a statutory fine upon the Fund for "doing business" without complying with the State's foreign corporation registration statute, *Arkansas ex rel. Bennett v. NAACP Legal Defense Fund*, No. 44679 (Cir. Ct. Pulaski County).

In *NAACP v. Button*, 371 U.S. 415 (1963), the Supreme Court invalidated such attempts, emphasizing that "Resort to the courts to seek vindication of constitutional rights is a different matter from the oppressive, malicious, or avaricious use of the legal process for purely private gain. . . . Nothing that this record shows as to the nature and purpose of NAACP activities permits an inference of any injurious intervention in or control of litigation which would constitutionally authorize the application of [the

similar Virginia law] to those activities," 371 U.S. at 444.[1] But while awaiting such ultimate judicial vindication, the Legal Defense Fund adopted the practice, in response to the widespread use of such devices in an effort to prevent its participation in civil rights litigation, see n.1 *supra*, of including a complete list of individual attorneys in the "signature block" on pleadings in cases in which it was involved to emphasize that individual lawyers, not a corporate entity, would be making litigation and representation decisions.

It is because of this practice, I believe, that my name may have been inserted on the first page of the paper docket. Although this is a rather long-winded explanation, I wanted to provide it to emphasize my conclusion that what happened when the addition was made to the first page of the docket sheet was, if not fully accurate, understandable. And I hasten to add that even if I had in fact participated in the district court litigation in this matter prior to 1980, my current personal circumstances would now compel me to seek the Court's leave to withdraw.

My own involvement in school desegregation cases in the Western District of Louisiana has always been fully consistent with the Court's Rules. I am fully aware that because I am not admitted to the Bar of Louisiana, I am ineligible to practice in the Western District except through leave of the Court following submission of an appropriate motion for admission *pro hac vice* supported by a member of the Bar of Louisiana and this Court.

At the time the electronic docket in this matter was created in 2012, I was on the roster of attorneys with CM/ECF filing privileges in the Western District as a result of my involvement in cases before Judge Melançon, including, for example, *Monteilh v. St. Landry Parish School Board*, No. 6:65-cv-10912-TLM. I was admitted *pro hac vice* in that case in association with

---

[1] Justice Douglas' concurring opinion in *Button* emphasized that "[t]he amendments to Virginia's code, here in issue, were enacted in 1956. Arkansas, Florida, Georgia, Mississippi, South Carolina, and Tennessee [footnote omitted] also passed laws following our 1954 decision which brought within their barratry statutes attorneys paid by an organization such as the N. A. A. C. P. [or Legal Defense Fund, *see* 317 U.S. at 417-22, describing interrelationship between NAACP and NAACP Legal Defense Fund] and representing litigants without charge.

attorney Marion Overton White; indeed, when I left full-time employment with the Legal Defense Fund in the fall of 2007, I withdrew from that representation; subsequently, in 2008, after I was asked to and agreed to continue work in several cases in a consultant status to the Fund, I sought re-admission in a *pro hac vice* capacity, which Judge Melançon granted. See Order of 10/6/08, No. 6:65-cv-10912-TLM (Doc. No. 214).

In other instances, I was admitted *pro hac vice* at hearings following oral motions by my associated Louisiana counsel; for example, in that circumstances I conducted a hearing in the Lafayette Parish case together with local attorney Hilry Huckaby in the mid-1970's and participated in many cases in the Eastern District of Louisiana during that decade under similar circumstances.

I set forth this history to emphasize that I would never have flouted the rules of this Court by attempting to appear as counsel in a matter without utilizing the procedures provided by the Court's rules.

I need not frame my request in those precise terms, however, because, as I shall now explain, the 1980 paper docket does not stand alone. Further developments in this litigation following the 11-4-80 entry on the paper docket make clear that neither I nor any other individual associated, previous to that time, in the representation of the plaintiff class in this matter currently have responsibilities for that representation.

As the paper docket from 1980 indicates, this matter was assigned the civil action number "9981" at its inception; that number appears as a stamp at the top of the first two pages of the 1980 paper docket and is typewritten or handwritten on subsequent pages. But this is not the end of the litigation. On November 4, 1980, a motion for additional relief was filed by attorneys Louis Berry and P. Spencer Torry, along with a "motion to be registered as attys for pltffs." The case was assigned to Judge Veron, who determined to treat it as a new suit, "supplementing" Civil Action No. 9981, and assigned the new Civil Action No. 80-1709.

I understand from our conversations that the Clerk's Office recognizes that Civil Action No. 80-1709 is a "related case" to the original Civil Action

No. 9981. While I do not have a problem with terminology, I must emphasize that the first page of the docket in No. 80-1709 specifically reflects Judge Veron's decision to "treat" the "Motion . . . for additional relief" as a new suit, supplementing the original case. If that decision by Judge Veron were sufficient to separate No. 80-1709 from No. 9981, then there could be no basis for including me as counsel, because my name appears nowhere on the docket in No. 80-1709 nor is any other attorney from the Legal Defense Fund identified on that docket.

Rather, I believe that without regard to labels, both the original proceedings memorialized on the original paper docket in No. 9981 and the subsequent "supplementary" proceedings memorialized on the docket in No. 80-1709 are part of the same case — and as I explain below any connection between the Legal Defense Fund and representation of the plaintiff class on whose behalf No. 9981 was prosecuted was severed as a result of the proceedings in the 1980's before Judge Veron in No. 80-1709.

It would be an understatement to say that the events in No. 80-1709 are in any sense easy to comprehend. The effort is complicated by the fact that the underlying files were apparently destroyed in a fire at some point and all that remained was the docket sheet, ultimately located in the Federal Records Center — as well as by the fact that many of the important actors are deceased, including both Mr. Berry and Ms. Torry. See docket sheet in No. 80-1709 at 1 of 9, showing handwritten word "Deceased" and names of both those individuals struck through.

With respect to my own relationship to this matter, I wish to make clear that I resigned from the staff of the Legal Defense Fund (LDF) in 1975 and relocated to Washington, D.C.; I did not return to LDF until 1986. During this period of time, I had no contact with the *Conley* case at all, nor any knowledge of the events reflected on the docket in No. 80-1709. Nothing on that docket indicates that any papers were ever served on LDF or any of its staff lawyers; subsequent to my return to the staff in 1986, I knew nothing of the matter until after the year 2000, and at that time I conducted an intensive search of LDF's files but was unable to find any indication that LDF ever received notice of the filings or events reflected on the docket in No. 80-1709.

The docket in No. 80-1709 does not indicate that the November 4, 1980 "motion to be registered as attys for pltffs" was ever ruled upon by Judge Veron, although by mid-1982 there appears to have been a "MOTION (Joint) for Approval of Settlement" submitted along with a "NOTICE of Pendency of Class Action and Proposed Compromise & Settlement" and a "CONSENT DECREE, Order and Judgment w/ Respect to Claims of Pltffs. And Defts." (Documents Nos. 25-28). On July 15, 1982 there is the following entry:

> MEMORANDUM RULING (EEV) Parties have agreed that plan is fair, reasonable and adequate. Ct makes no findings /conclusions."

Thereafter, on May 19, 1983, a "MOTION(P/Intvr.)" was filed, which the Court on May 23, 1983 "granted & motion for addti. relief is denied" (Docs. 30-32). On September 19, 1983, there was a "MOTION (Attys Ieyoub & Singleton) to enroll as co-counsel for Lawrence Conley[2] w/ note from EEV to place this on motion calendar (Doc. 33). Following a postponement, on October 17, 1983 attorneys Berry and Torry submitted an "OPPOSITION (Attys Berry & Torry) to motion to enroll as co-counsel by Attys Ieyoub & Singleton . . . and Memorandum in Opposition (Doc. 37). Finally, at the hearing held November 30, 1983 the Court denied the motion of Attorneys Ieyoub and Singleton to enroll as co-counsel for the parent of the lead original minor plaintiffs [see n.2 *supra*] — Lawrence Conley (Doc. 39).

As confusing as these events are to reconstruct, it seems evident that there were competing efforts by attorneys Berry and Torry, on the one hand, and Ieyoub and Singleton, on the other, to represent the class of minor plaintiffs on whose behalf Civil Action No. 9981 was originally prosecuted — none of which efforts involved either myself nor any other attorney from the Legal Defense Fund.

On December 12, 1983, a "MOTION (Joint) to settle outstanding issues and for Ct. to enter an order giving notice of settlement to class members and

---

[2]Lawrence Conley was the parent and next friend of Ricky Dale Conley, the first-listed minor plaintiff in the original school desegregation action.

to fix hearing date" was filed (Doc. 43). On the same date, Judge Veron issued an "ORDER (EEV) setting hearing on 1-30-84 to determine whether proposed consent decree, order & judgment should be finally approved" (Doc. 44), and the Clerk issued a "NOTICE of pendency of class action & proposed compromise and settlement" (Doc. 45). On December 27, 1983 attorney Homer Singleton filed a "MOTION . . . to traverse adequacy of named representatives of the class and adequacy of representation of counsel for the class" (Doc. 50). On the same date, Judge Veron issued an "ORDER (EEV) #50 will be heard on 1-30-84 at 9:00 AM" (Doc. 51).

Prior to the hearing, a group of letters opposing the proposed Consent Decree were submitted to the Court (Docs. 55-58, 60-63, 68-69). At the hearing on January 30, the Court denied attorney Singleton's motion to contest the adequacy of class representation by the proponents of the Consent Decree (Doc. 70) and requested briefing by the parties, holding the record open until February 3, 1984 "to allow students to express their feelings in writing" (Doc. 71). Finally, on April 3, 1984 Judge Veron entered his RULING on FRCP § 23(e) Motion to Approve Proposed School Desegregation Plan - approved subject to suggested modification by the Ct" (Doc. 77).

On May 2, 1984, a Notice of Appeal was filed from that ruling (Doc. 79).[3] It is significant to note that the Notice of Appeal was sent by the Clerk to the "Ct. Appeals, Berry, Torry w/app info ltr, Belfour, Katz, Veron" (see Doc. 79). The appeal from Judge Veron's ruling approving a plan for the operation of the Lake Charles/Calcasieu Parish schools therefore involved competing claims to represent the interests of the plaintiff class between attorneys Berry and Torry, on the one hand, and Singleton [and perhaps Ieyoub, though that is less clear] on the other. No consideration was given to the former class representation by attorneys affiliated with the Legal Defense Fund. It is for this reason that I believe that resolution of the appeal, and effectuation of Judge Veron's ruling, severed any connection between the plaintiff class in the original *Conley* litigation and LDF or its attorneys, including myself.

---

[3]That appeal was dismissed by the Fifth Circuit, whose mandate issued on January 11, 1985 (see Docs. 81-82). However, the decision was unpublished, see 751 F.2d 381 (5th Cir. 1984) and the opinion, if any, is not available to me.

I am sympathetic to the plight of the Court, but given the tortuous history of this matter, as outlined in some detail above, as well as my personal circumstances, I am unable to continue to be involved in active litigation. I would prefer not to detail those circumstances unless it becomes necessary, but I can say generally that they involve age (I will be 70 in a month or two and have worked in this substantive area, requiring very heavy travel, for more than 40 years), health, and family circumstances.

So for all of these reasons, I hope that you, with the authorization of the Court, will be willing to delete my name from the electronic docket in this matter. As I explain above, I do not believe that under the circumstances of this matter, the Legal Defense Fund, institutionally, has any continuing relationship to the plaintiff class in this case either. I would be happy to have a conversation with you, or the Court, or Judge Minaldi's law clerk, about this matter should they desire. Thank you for your patience in reading through this lengthy explanation.

Respectfully yours,

Norman J. Chachkin